UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARGARET ROGERS; MARGARET ROGERS as parent
and next friend of Gwendolyn Rogers; KATHLEEN CHURCH;
KATHLEEN CHURCH as parent and next friend of Kary Church
and Keith Church; COLLEEN ARNESON; COLLEEN ARNESON as
parent and next friend of Tayla Arneson and Kyle Arneson;
ANA DESAUTEL; ANA DESAUTEL as parent and next
friend of Cassandra Desautel; JOANNE BONOLLO; JOANNE
BONOLLO as parent and next friend of Destiny Bonollo and Allison
Bonollo; AMY BREAULT ZOLT; AMY BREAULT ZOLT
as parent and next friend of Erik Breault, Max Breault, and
Tyler Breault; LINDA GHAZAL; LINDA GHAZAL as parent
and next friend of Tabatha Ghazal and Adam Ghazal,
                                Plaintiffs,


                    v.                                    C.A. No. 09-493 ML

WILLIAM D. MULHOLLAND, in his capacity as Superintendent
of the Parks and Recreation Division for the City of Pawtucket;
DONALD R. GREBIEN, in his capacity as Mayor of the City of
Pawtucket; and ROBERT HOWE, in his capacity as Director of
Public Works,
                                Defendants.


                            DECISION AND ORDER

        Plaintiffs bring this action under 42 U.S.C. § 1983 seeking injunctive and declaratory

relief.  Plaintiffs contend that Defendants have violated the First, Fifth, and Fourteenth

Amendments of the United States Constitution and Article I, Sections 2 and 3 of the Rhode

Island Constitution by preferentially allocating permits for the use of publicly owned and

maintained athletic fields to private religious schools.  The action was tried by the Court sitting

without a jury and the parties have submitted post-trial memoranda.  The Court's findings of fact

                                        1

and conclusions of law are set forth below.

## I.  Background

Pawtucket is a city of approximately nine square miles with approximately 70,000 residents.  The City has three public high schools: William E. Tolman ("Tolman"), Charles E. Shea ("Shea"), and Jacqueline Walsh School for the Performing Arts ("Walsh");[1] two private Catholic high schools: St. Raphael Academy ("SRA"), and Bishop Keough High School ("Keough"); three public junior high schools: Samuel Slater ("Slater"), Joseph Jenks ("Jenks") and Lyman Goff ("Goff"); and three private Catholic elementary/junior high schools (kindergarten through eighth grade): St. Cecilia's, St. Theresa's and Woodlawn Catholic Regional.  Plaintiffs are City residents and the parents of children who attend or have attended City public schools.

The schools (both public and private) within the City, for the most part, do not have athletic fields on their grounds; therefore athletic teams fielded by the schools must share use of City-owned and maintained fields.  In some circumstances, student-athletes must travel several miles to get to the fields they are assigned for their "home" games and practices.  The City does not generally provide transportation to home games or practices for public school students.  The matter before the Court primarily concerns the City's fall football and soccer field permitting policies.

Each year, several months before the fall athletic season, the athletic directors at Tolman,

---

[1] Walsh does not have an independent athletic program.  Students attending Walsh may participate in either Tolman or Shea athletic programs depending upon the school district in which they reside.  The City also has a number of public charter schools.  Students at public charter high schools are also allowed to participate in either Tolman or Shea athletic programs depending upon the school district in which they reside.

Shea, SRA, and Keough submit requests for permits to use particular fields, on specific days and times, for their school's soccer and/or football teams' games and practices. The athletic directors at both Tolman and Shea also submit the field permit requests for the public junior high schools. Because of the younger age of junior high student-athletes, it is the practice of the public school athletic directors to schedule junior high games and practices immediately after school at a field that is within close proximity to the school. John Scanlon, Jr. ("Scanlon"), the Athletic Director at Tolman, testified, however, that "high school games get preference" in scheduling and that there is a "pecking order in . . . school sports in general. The pecking order . . . is high school first, junior high second. That's in the budgeting process all the way up to the scheduling process." December 19, 2011, Transcript at 52, 77.

A school may field multiple teams in a single sport. For example, Tolman maintains a boys varsity and a junior varsity soccer team and a girls varsity soccer team. Tolman also fields a freshman, a junior varsity, and a varsity football team. Goff maintains both a girls and a boys soccer team while Slater and Jenks each maintain a co-ed soccer team. The athletic fields that are pertinent to this matter are: Fairlawn Veteran's Park, Max Read Field, McKinnon/Alves Soccer Complex, Pariseau Field, O'Brien Field, Coutu Field, and Tomlinson Complex.[2] In 2011, the City budgeted approximately $40,000 to $50,000 for maintenance and supplies (exclusive of labor costs) for upkeep of City athletic facilities.[3]

Up until 2010, the City did not have written policies governing the field permitting process. William Mulholland, ("Mulholland"), the Superintendent of Parks and Recreation for

---

[2]The Court took a view of all of the fields except for Coutu Field.

[3]There are other athletic facilities in the City in addition to those noted.

the City, made the permitting decisions on a case-by-case basis.[4]  His decisions were largely

governed by "grandfather rights," i.e., a school's historic use of a field.  In making his decisions,

however, Mulholland also considered the proximity of a field to a school, the general condition

of the field, whether the school assigned the permit in the past took appropriate care of the field,

and the general adaptability of a field to the particular sport.  In assigning fields for games, public

school games were given first preference.  There was, however, no preferential assignment for

practices.  When two or more schools requested the same field at the same time, Mulholland

sought the guidance of his supervisor, the Director of Public Works.

This dispute mainly concerns the permitting of O'Brien Field and Field 2 at

McKinnon/Alves Soccer Complex in the fall athletic season.  O'Brien Field is adjacent to Jenks

and approximately one-tenth of a mile from SRA.  For the most part, O'Brien Field is considered

a practice field for football or soccer.  O'Brien Field was "reconstructed" in or about 2001.  In

the reconstruction, the City added an irrigation system and turf, removed trees, installed banking,

and fenced the field.  The work on the field was financed through a grant from the United States

Government.  Prior to its reconstruction, however, the City permitted O'Brien Field to SRA for

football practice on a regular basis.  Mulholland estimated that, generally, the cost to the City to

maintain O'Brien Field on an annual basis (exclusive of labor) was approximately $9,000.

From approximately 2001 to 2008, both Scanlon and SRA requested a permit for the use

of O'Brien Field during the fall season: SRA for football practice and Scanlon for public junior

high school soccer practices and games.  Up until 2007, SRA was granted the permit and

Scanlon's request was denied.  Mulholland testified that, during this time, because both schools

---

[4]Mulholland retired in June 2011.

requested the field at the same time, he sought guidance from the Director of Public Works and was told to continue to issue the permit to SRA. Mulholland testified that, as an alternative to O'Brien Field, the City offered Pariseau Field to Jenks. Mulholland testified that Pariseau Field was within the same proximity that O'Brien Field was to Jenks; it had bleachers and restroom facilities; and it was, generally, a better facility than O'Brien Field. Scanlon testified, however, that in 2009 and 2010, because of a shortage of City workers, Pariseau Field was not appropriately "lined" for soccer. In 2008, Jenks received the permit for O'Brien Field. SRA received the permit for O'Brien Field in 2009 and 2010 and Jenks received the permit for O'Brien in 2011.

Generally, during the years pertinent to this matter, Shea had exclusive use of Max Read Field for football practice and games. The record also reflects that Tolman was routinely assigned Coutu Field for football practice. Coutu Field is located approximately 20 yards from Tolman. Tolman and SRA played their home football games at Pariseau Field. If there was a conflict in game times at Pariseau Field, Tolman received a preference and SRA was required to reschedule its game.

McKinnon/Alves Soccer Complex is comprised of three soccer fields. Fields 1 and 3 are located on the outside borders of the complex and field 2 is located between fields 1 and 3. The fields are used for soccer practice and games. Field 2 is the least desirable field because it has the greatest potential of interference from fields 1 and 3. Generally, during the 2001-2008 fall seasons, the City public high and junior high schools shared fields 1 and 3 and SRA and Bishop Keough shared field 2. Scanlon estimated that, generally, eight to ten public school teams shared fields 1 and 3. Although Scanlon testified that he made "requests" for the permit for

5

McKinnon/Alves Field 2 prior to 2008, he did not specify in what years he requested the permit
for Field 2 before 2008.  December 19, 2011 Transcript at 51.

Scanlon testified that, prior to the fall of 2008, he was not getting enough field
assignments for soccer practices.  Scanlon stated that in order to provide adequate fields for
soccer practice he had to move the starting times for Tolman junior varsity and freshman football
home games to later in the afternoon at Pariseau Field.  The Court agrees with Defendants'
contention that, at most, Scanlon would have to had delay the starting times of football games
between eight to ten times during the season.

In the fall of 2008, Scanlon's request for McKinnon/Alves Field 2 was denied but his
request for O'Brien Field, for the first time, was granted.  Although SRA received the permit for
McKinnon/Alves Field 2, Scanlon testified that "for the most part" he did not have any
scheduling problems.  December 19, 2011, Transcript at 63.  Scanlon testified that although he
preferred not to, he scheduled some public junior high soccer games at O'Brien Field.  In the fall
of 2008, instead of O'Brien Field, SRA received the permit to hold football practice at Pariseau
Field.  After the 2008 season, however, Pariseau Field needed to be reconstructed as a result of
the heavy play it endured from high school football games and practices and City youth football
games.  As a result, the City determined that Pariseau Field should not be used for football
practice.  During the 2008 fall season, Scanlon and the SRA principal had an informal agreement,
whereby if the public schools were not using O'Brien Field, Scanlon would contact SRA and
notify SRA that it could use the field.

In or about September 2009, Scanlon forwarded a letter to the Pawtucket City Council
informing Council members that "obtaining space for soccer teams in the fall has been an

adventure." Plaintiffs' Exhibit 18. In the letter, Scanlon also stated that he "found it impossible to accommodate the need for field space for the junior high[] [schools]." Id. Scanlon noted that he had requested the use of O'Brien Field in 2009 but that O'Brien was "given to [SRA] for football practice." Id. At or about that time, Scanlon testified that Mulholland informed him that as a result of budget cuts, the Tomlinson Complex could no longer be "lined" for soccer games. Mulholland testified, however, that the City was offering alternatives to the Tomlinson Complex.

In 2009 Scanlon again requested permits for O'Brien and McKinnon/Alves Field 2. SRA, however, received the permits for O'Brien Field and McKinnon/Alves Field 2. Mulholland informed Scanlon that Jenks could use Pariseau Field for soccer practice instead of O'Brien Field. During this season, Keough requested a permit for McKinnon/Alves Field 3. Keough was informed that it would have to compromise its request for McKinnon/Alves Field 3 to allow the scheduling of public high and junior high school soccer games because those games received preferential treatment. Mulholland testified that Keough was informed that its team could either play *after* the public school games or attempt to identify an alternative date. In addition, Slater was granted the permit for soccer practice at Veteran's Park; Keough had access to Veteran's Park for soccer practice only when Slater was not using that field.

Scanlon testified generally that he had difficulties scheduling practices and games in 2009 and that he had to move the starting times for some Tolman junior varsity and freshman football games to later in the afternoon. During the 2009 season, no public school games were cancelled but "some" public high school soccer practices were cancelled because, according to Scanlon, there was no available field. December 19, 2011 Transcript at 71. Scanlon, however, did not quantify how many practices were cancelled. Scanlon asserted that had he been granted his

requests for O'Brien and McKinnon/Alves Field 2 he would have had adequate field space for all public school teams. Notwithstanding the cooperative agreement reached concerning O'Brien Field in 2008, in 2009, Scanlon did not contact the City or SRA to inquire whether the public schools could use O'Brien Field when SRA was not using it.

In the spring of 2010, the City adopted written policies governing the field permitting process. After the policies were adopted, however, Mulholland continued to issue permits in the same manner he did prior to the adoption of the policies. Mulholland testified, however, that he believed the written policies, for the most part, codified the unwritten policies that had been in effect prior to 2010.

In 2010, Scanlon again requested the permits for McKinnon/Alves Field 2 and O'Brien Field. SRA, however, received the permits for both fields. Scanlon was granted the permit for Pariseau Field in place of O'Brien Field. Scanlon testified that because he was not granted an alternative field to McKinnon/Alves Field 2, a "number" of public school soccer practices were cancelled. Transcript, December 19, 2011, at 76. Scanlon noted that "in some cases" when the Tolman soccer team was assigned to Tomlinson Complex for practice "[p]arents weren't too happy . . . [a]nd in some cases they . . . chose to cancel the practice rather than go that far away." Id. at 77.[5]  Once again, however, Scanlon did not quantify how many practices were cancelled. Moreover, he did not explain whether the "number" of practices that were cancelled were cancelled because no field was available or because a team chose not to travel to an available field. Mulholland testified that he did not offer an alternative field to McKinnon/Alves Field 2 to Scanlon because Scanlon did not ask for one and because it was the first time Scanlon had

_____

[5]Tomlinson is approximately 2.4 miles from Tolman.

8

requested McKinnon/Alves Field 2.[6]

In 2010, the City permitted McKinnon/Alves Field 3 for games but not practices. Therefore, in the event a game had to be rescheduled because of inclement weather, Field 3 had available dates to reschedule the games. Mulholland testified that, on occasion, Field 3 was vacant and all schools were allowed to use the field without a permit.

In 2011, Scanlon received the permits for both O'Brien and McKinnon/Alves Field 2. SRA and Keough played soccer games at McKinnon/Alves Field 2; however, to accommodate public school teams assigned the same field, SRA and Keough games were assigned later starting times. SRA was permitted Tomlinson Complex two to three days per week for football practice. Practice at Tomlinson required SRA to transport the players to the field. For the 2011 fall season, Scanlon testified that he had adequate field space for practices and games. In fact, Scanlon did not use O'Brien Field on all the days it was permitted to Jenks. Again in 2011, the City and Scanlon reached a cooperative agreement whereby Scanlon would notify the City if Jenks was not using O'Brien Field and the City would notify SRA that SRA could use O'Brien Field. In fact, the City actually permitted SRA the use of O'Brien Field on the days Jenks was not using the field.

At some point in 2010, Christopher Crawley, the Assistant Superintendent of Parks and Recreation, became responsible for issuing permits for use of the City's athletic fields. During 2010, the City began using a computer program in the permitting process. Crawley testified that the computer program streamlined the permitting process and made it more detailed and accurate. Crawley, like Mulholland, testified that if two or more schools requested the same field

---

[6]The record reflects that this was not the first time Scanlon requested McKinnon/Alves Field 2.

at the same time he would bring that matter to the attention of his supervisor. Crawley testified that he permitted games first and then practices. Crawley also testified that, in 2011, he adhered to the written policies that the City adopted in 2010.

With the adoption of the written policies, the City also set a June 15 deadline for the submission of permit requests for the fall season. For the 2011 season, Crawley received the requests from the public schools by the June 15 deadline. Keough, however, did not forward its request to Crawley until July 1, 2011. Before the deadline passed, however, Crawley noticed that SRA had forwarded him an email requesting fields but SRA had not submitted the official permit applications. Crawly contacted SRA and informed SRA administration that SRA needed to submit the official applications. SRA, however, did not submit the official applications on a timely basis. As late as September 6, 2011, however, Crawley was holding fields for SRA even though Scanlon had filed timely permit requests requesting some of the same fields. Crawley testified that this was an oversight on his part because he did not realize that SRA had not forwarded him timely official permit applications. At some point after June 15, SRA submitted official permit applications. For the 2011 season, the City granted all *timely* filed permit requests. Only after those permits were issued were permits issued to SRA and Keough for the fields that remained available. According to Crawley, all schools had adequate field space for games and practices during the 2011 season.

After football season is over, the City slice seeds O'Brien Field and locks it, thereby restricting access to the field until the following late summer. Mulholland testified that, in the past, the City permitted O'Brien Field in the spring for adult soccer but the City found that the adult spring soccer did significant damage to the field and the City decided to stop permitting the

field for spring soccer. SRA and two public schools, however, have access to the field during the time it is locked in order to use the field for physical education classes. Mulholland explained that the slice seeding process is performed at all of the City football fields. Mulholland also testified that other fields are locked at different times during the year. He explained that the City locks the gate at Coutu Field during the winter months, however, the field has other access to it because it includes a basketball court. The City locks Max Reed Field and the McKinnon/Alves Soccer Complex for the entire season to prevent access without permits. He also testified that although the City cannot lock Pariseau Field because it has a track, the City may close the field for approximately one month on an annual basis.

Mulholland disputed Scanlon's assertion that he did not have enough field space for public school teams. Mulholland stated that there were alternative fields available for use at the times Scanlon asserted that he had insufficient field space. Mulholland testified that if Scanlon believed he had insufficient field assignments it was his responsibility to request an alternative field.

## II. Standing

Plaintiffs maintain that they have standing as municipal taxpayers. It is black letter law that before this Court may consider the merits of any claim, the party seeking to invoke this Court's jurisdiction must establish the requisite standing to bring suit. Whitmore v. Arkansas, 495 U.S. 149 (1990). In order to establish standing, Plaintiffs must demonstrate "a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to . . . [D]efendant[s'] actions, and a likelihood that prevailing in the action will afford some redress for the injury." Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 317 (1st Cir. 2012) (internal

11

quotation marks and citation omitted.).

The United States Supreme Court has recognized three types of taxpayer standing: federal, state, and municipal. Smith v. Jefferson County Board of Commissioners, 641 F.3d 197 (6th Cir. 2011). As a general rule, a taxpayer complaining that the government has misspent tax dollars lacks the "concrete and particularized" injury requirement to establish standing. American Atheists, Inc. v. City of Detroit, 567 F.3d 278, 284 (6th Cir. 2009) (internal quotation marks and citation omitted). Municipal taxpayers, however, are required to meet a somewhat less rigorous injury standard. Smith, 641 F.3d 197. To establish the injury requirement, a municipal taxpayer must establish that (1) she pays taxes to the relevant authority, and (2) tax revenues are expended on the challenged practice. Pelphrey v. Cobb County, Ga., 547 F.3d 1263 (11th Cir. 2008); Ward v. Sante Fe Independent School District, 393 F.3d 599 (5th Cir. 2004); see also Donnelly v. Lynch, 691 F.2d 1029, 1031 (1st Cir. 1982) (municipal taxpayers can challenge "allegedly unconstitutional use of their tax dollars"), rev'd on other grounds, 465 U.S. 668 (1984).

Plaintiffs Margaret Rogers, Linda Ghazal and Ana Desautel each pay municipal property taxes to the City and the City expends tax revenue in administering the field permitting process and in maintaining City athletic facilities. Plaintiffs Margaret Rogers, Linda Ghazal and Ana Desautel meet the required injury in fact prong of the standing analysis.

Injury, however, is only part of the standing analysis. Plaintiffs must also establish that the challenged action caused the injury and the injury would be redressed by a favorable decision by the Court. Antilles, 670 F.3d 310. There is a direct causal connection between the City's permitting policies and the purported injury, here the alleged misuse of public funds. Plaintiffs

12

seek declaratory and injunctive relief to end the City's allegedly discretionary pro-sectarian field permitting policies. Thus, a favorable ruling in this matter would remedy Plaintiffs' alleged injury. Plaintiffs Margaret Rogers, Linda Ghazal and Ana Desautel have municipal taxpayer standing.

### III. The Claims

Plaintiffs raise four constitutional challenges to the City's field permitting policies. Plaintiffs bring two federal claims: an Establishment Clause and an Equal Protection claim pursuant to the First, Fifth and Fourteenth Amendments of the United States Constitution. Plaintiffs also bring two state law claims: a Freedom of Religion and Equal Protection claim pursuant to Article I, Sections 2 and 3 of the Rhode Island Constitution. Plaintiffs seek declaratory and prospective injunctive relief and attorney's fees and costs.

Article I, Section 3 of the Rhode Island Constitution, titled "Freedom of [R]eligion," and the First Amendment provide similar protections. In re Phillip S., 881 A.2d 931 (R.I. 2005); Bowerman v. O'Connor, 104 R.I. 519, 521, 247 A.2d 82, 83 (1968) (Article I, Section 3 is not "more restrictive" than the language of the First Amendment). Likewise, the "drafters of the Rhode Island Constitution intended the Equal Protection Clause of the Rhode Island Constitution [Article I, Section 2] to provide protection similar to the Equal Protection Clause of the Fourteenth Amendment." Pawtucket Transfer Operations, LLC v. City of Pawtucket, 539 F. Supp. 2d 513, 522 n.7 (D.R.I. 2008). Consequently, because an analysis of the federal claims will be dispositive of the state law claims, the Court need only focus on Plaintiffs' federal claims.[7]

---

[7]Neither party presented argument on the state law claims.

## IV.  The Establishment Clause

"The civil sword . . . cannot rightfully act either in restraining the souls of the people

from worship or in constraining them to worship. . . ." Edward J. Eberle, Roger Williams' Gift:

Religious Freedom in America, 4 Roger Williams U. L. Rev 425, 457 n.145 (1999).  Under the

Establishment Clause "Congress shall make no law respecting an establishment of religion. . . ."

U.S. Const. amend. 1.[8]  "Although applicable originally only against the federal government, the

Establishment Clause was incorporated to apply to the states by the Fourteenth Amendment."

Freedom From Religion Foundation v. Hanover School District, 626 F.3d 1, 6-7 (1st Cir. 2010).

The defining principle of the First Amendment is that it "mandates government neutrality

between religion and religion, and between religion and nonreligion." McCreary County,

Kentucky v. ACLU of Kentucky, 545 U.S. 844, 860 (2005) (internal quotation marks and

citation omitted).  "When the government acts with the ostensible and predominant purpose of

advancing religion, it violates the central Establishment Clause value of official religious

neutrality, there being no neutrality when the government's ostensible object is to take sides." Id.

Total separation between Church and State, however, is not possible in the strict or

absolute sense, nor is it required by the Constitution.  See generally Lynch v. Donnelly, 465 U.S.

---

[8]At the outset, the Court recognizes that case law scrutinizing challenged conduct and interpreting the Establishment Clause is complex and generates "strong emotions." See generally Weisman v. Lee, 908 F.2d 1090, 1090 (1st Cir. 1990) (Bownes, J., concurring), aff'd, 505 U.S. 577 (1992); Ahlquist v. City of Cranston, ___. F. Supp. 2d ____, ____, 2012 WL 89965 at *11 (D.R.I. Jan. 11, 2012) (noting that "[t]hough the words [of the Establishment Clause] are simple, their application to the circumstances of our evolving nation has been complex and contentious"); Jeremy Patrick-Justice, Strict Scrutiny for Denominational Preferences: Larson in Retrospect, 8 N.Y. City L. Rev. 53, 53 n.1 (2005) (the "[E]stablishment [C]lause is a perennially disputatious topic fraught with emotion") (internal quotation marks and citation omitted); Jeffrey R. Wagner, A Survey of the Supreme Court's Approach to the Establishment Clause in Light of Allegheny v. American Civil Liberties Union, 35 St. Louis U. L.J. 169, 203 (1990) (Establishment Clause cases primarily deal with an "emotional topic and polarized points of view").

668 (1984).

> [R]ecognizing that this Nation's history has not been one of entirely sanitized
> separation between Church and State, the Supreme Court has noted that it has
> never been thought either possible or desirable to enforce a regime of total
> separation.  Thus, the principle is 'fixed' that a government program or law which
> in some manner aids an institution with a religious affiliation does not, for that
> reason alone, violate the Establishment Clause.

Ehlers-Renzi v. Connelly School of the Holy Child, Inc., 224 F.3d 283, 287 (4th Cir. 2000)

(internal quotation marks and citations omitted).  The line, however, between "neutrality and

permissible accommodation, on the one hand, and improper sponsorship or interference, on the

other, must be delicately drawn . . . to prohibit" the establishment of religion.  Id. at 287-88.

 The Establishment Clause "serves not as a closed door, but as a judicious chaperone; it permits a

certain degree of impartial and friendly dialogue, but is swift to step in once that dialogue turns

stigmatic or coercive."  Johnson v. Poway Unified School District, 658 F.3d 954, 971-72 (9th

Cir. 2011) (emphasis in original).  Establishment Clause concerns "arise not when religion is

allowed by government to exist or even flourish, but when government sets a religious agenda or

becomes actively involved in religious activity."  Boyajian v. Gatzunis, 212 F.3d 1, 10 (1st Cir.

2000).

> In our modern, complex society, whose traditions and constitutional
> underpinnings rest on and encourage diversity and pluralism in all areas, an
> absolutist approach in applying the Establishment Clause is simplistic and has
> been uniformly rejected by the [Supreme] Court.  Instead, a court should
> scrutinize challenged . . . conduct to determine whether, in reality, it establishes a
> religion or religious faith, or tends to do so.

Americans United For Separation of Church and State v. Prison Fellowship Ministries, Inc., 509

F.3d 406, 423 (8th Cir. 2007) (emphasis in original) (quoting Lynch, 465 U.S. at 678).

Given the complexity in comprehending and explaining the meaning of the ten words that

15

make up the Establishment Clause, and the countless ways in which Establishment Clause

challenges arise, the Supreme Court has not "set forth a one-size-fits-all test" to determine

whether or not governmental conduct runs afoul of the Establishment Clause.  Newdow v.

Roberts, 603 F.3d 1002, 1017 (D.C. Cir. 2010) (Kavanaugh, J., concurring).  The Supreme Court

has, however, espoused several methods of analysis to determine whether government conduct

offends the Establishment Clause.  The Court's articulation and application of those standards

however, has lead lower courts to suggest that Establishment Clause jurisprudence is "muddled"

and in "hopeless disarray," Bauchman v. West High School, 132 F.3d 542, 551 (10th Cir. 1997)

(internal quotation marks and citation omitted), "rife with confusion," Croft v. Perry, 624 F.3d

157, 165 (5th Cir. 2010) (internal quotation marks and citation omitted), and "convoluted,"

ACLU of Kentucky v. Grayson County, Kentucky, 591 F.3d 837, 845 (6th Cir. 2010); see also

Freedom From Religion Foundation v. Hanover School District, 665 F. Supp. 2d 58 (D.N.H.

2009), aff'd, 626 F.3d 1 (1st Cir. 2010) (noting at least six different Establishment Clause

approaches).

 Fortunately, in Hanover School District, the First Circuit provided clear guidance to trial

courts who must decide Establishment Clause challenges.  See Hanover School District, 626 F.3d

1.  In Hanover School District, the First Circuit found that the Supreme Court had "articulated

three interrelated analytical approaches" to determine whether governmental conduct violates the

Establishment Clause: the Lemon test; the endorsement analysis; and the coercion analysis.  Id. at

7.  It goes without saying that Plaintiffs bear the burden of proving that the Defendants have

violated the Establishment Clause.  American Atheists, Inc. v. Davenport, 637 F.3d 1095, 1118

n.10 (10th Cir. 2010).

## A.  The Lemon Test

In <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971), the United States Supreme Court set forth a

three-part test to apply in Establishment Clause cases.[9]  To determine whether government

conduct violates the Establishment Clause under <u>Lemon</u>, courts consider (1) whether the conduct

has a secular purpose, (2) whether the conduct's principal or primary effect is one that neither

advances nor inhibits religion, and (3) whether the conduct fosters an excessive government

entanglement with religion.  <u>Hanover School District</u>, 626 F.3d at 9.[10]  Government conduct

violates the Establishment Clause if it fails to satisfy any of the <u>Lemon</u> prongs.  <u>Edwards v.</u>

<u>Aguillard</u>, 482 U.S. 578, 583 (1987).

"The secular purpose prong of <u>Lemon</u> requires [the Court] to determine whether the

predominant purpose of the practice in question is secular."  <u>Weisman</u>, 908 F.2d at 1094, <u>aff'd</u>,

505 U.S. 577 (1992); <u>see also</u> <u>McCreary</u>, 545 U.S. 844; <u>ACLU of Kentucky v. Mercer County,</u>

<u>Kentucky</u>, 432 F.3d 624, 630 n.5 (6th Cir. 2005).  "The eyes that look to purpose belong to an

'objective observer'" and require no "judicial psychoanalysis. . . ."  <u>McCreary</u>, 545 U.S. at 862.

The purpose test is "rarely . . . determinative" in Establishment Clause challenges because

"government does not generally act unconstitutionally, with the predominant purpose of

---

[9]<u>Lemon</u> has not escaped criticism.  <u>See generally</u> <u>Hanover School District</u>, 626 F.3d at 9 n.16 ("[a]lthough the <u>Lemon</u> analysis has been often criticized . . the [Supreme] Court has never expressly rejected it . . .").

[10]Some courts suggest that the second and third prongs of the <u>Lemon</u> test have been combined.  <u>See</u> <u>Bader v. Wren</u>, 532 F. Supp. 2d 308, 313 (D.N.H. 2008) (second and third factors "fused into one").  Other courts describe the two factors as being "link[ed]," <u>Skoros v. City of New York</u>, 437 F.3d 1, 18 (2d Cir. 2006), or "often interrelated." <u>Midrash Sephardi, Inc. v. Town of Surfside</u>, 366 F.3d 1214, 1240 n.19 (11th Cir. 2004).  The third prong of the <u>Lemon</u> test was "not at issue" in <u>Hanover</u>, however the <u>Hanover</u> court listed the entanglement prong as a separate factor of the <u>Lemon</u> test.  <u>Hanover School District</u>, 626 F.3d at 9.  This Court does not wish to further contribute to the confusion surrounding Establishment Clause jurisprudence and chooses the clearer route for the reader; thus the Court will perform a separate analysis under all three of the <u>Lemon</u> prongs. See <u>Ahlquist</u>, ___ F. Supp. 2d at ____, 2012 WL 89965 at *13 (performing a separate analysis under all three prongs).

advancing religion." Id. at 859, 863 (internal quotation marks and citation omitted). In those instances where the United States Supreme Court has found an illegitimate purpose, "openly available data supported a commonsense conclusion that a religious objective permeated the government's action." Id. at 863 (emphasis added).

Plaintiffs argue that the City has violated the Establishment Clause by preferentially allocating permits to religious schools. Plaintiffs aver that the manner in which the City permits fields has both the purpose and effect of impermissibly aiding religious schools. The record, however, does not support Plaintiffs claim of preferential allocation. The City's permitting policies give first preference to the scheduling of public school games, thus both public high school and junior high school games are permitted first and take precedence over the permitting of private school games. Because Tolman and SRA play their home football games at Pariseau Field, if there is a conflict in the scheduling of a game, Tolman, the public school, takes precedence over SRA, the private school, and SRA has to reschedule its game. Likewise, in 2009, Keough had to compromise its request for McKinnon/Alves Field 3 when the City gave first preference to the scheduling of public junior high and high school soccer games on Field 3. The *public* school preference, however, goes beyond the scheduling of games. For example, Slater receives the permit to hold soccer practice at Veteran's Park and Keough can only use the field for soccer practice when Slater is not using it. Although SRA had exclusive use of O'Brien Field prior to 2008 for football practice, for the past four years SRA has not had exclusive use of O'Brien Field; in both 2008 and 2011 Jenks received the permit for O'Brien.

The Court need not complicate a simple analysis: the City's permitting policies implement the clearly secular purpose of allocating limited game and practice field space to all

junior high and high school students within the City.  In <u>Mueller v. Allen</u>, 463 U.S. 388 (1983),

the United States Supreme Court upheld a state statute that allowed taxpayers to deduct expenses

incurred in providing tuition, textbooks and transportation for their children attending elementary

and secondary schools.  The <u>Mueller</u> Court stressed that the deduction was available to "<u>all</u>

parents – whether their children attend public school or private. . . ." <u>Id.</u> at 398 (emphasis in

original).  In the matter before this Court, "the class of beneficiaries include[s] <u>all</u> [junior high

and high] schoolchildren, those in public as well as those in private schools." <u>Id.</u> (internal

quotation marks and citation omitted).  This is certainly not the case where the record supports a

"commonsense conclusion that a religious objective <u>permeated</u> the government's action."

<u>McCreary</u>, 545 U.S. at 863 (emphasis added).  The City's permitting policies have a predominant

secular purpose.

      Plaintiffs argue that the City's permitting policies impermissibly aid Catholic schools.[11]

Under the second prong of <u>Lemon,</u> the government's conduct cannot have the "principal or

primary effect of endorsing" religion.  <u>Boyajian</u>, 212 F.3d at 6 (internal quotation marks and

citation omitted).  For government conduct "to have forbidden 'effects' under <u>Lemon</u>, it must be

fair to say that the <u>government</u> <u>itself</u> has advanced religion through its own activities and

influence." <u>Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day

Saints v. Amos</u>, 483 U.S. 327, 337 (1987) (emphasis in original).

      In determining effect, the Court must consider the context and circumstances of the

---

[11]In essence, Plaintiffs argue that because the only private schools that benefit from the City's permitting policies are Roman Catholic, the City has violated the Establishment Clause.  Plaintiffs' argument ignores the practical reality of the situation: the record reflects that the only private schools in the City are Roman Catholic. Consequently, any benefit granted to all school children in the City could only benefit one type of private school, a Catholic school.  Other than Plaintiffs' conclusory argument, there is nothing in the record to suggest that the City would not allow other private schools (if there were any in the City) to participate in the permitting process.

conduct. Hanover School District, 626 F.3d at 10. Here, Plaintiffs challenge the City's athletic field permitting policies. The athletic events at the core of this matter, mainly football and soccer games and practices, are wholly secular in nature and convey no religious message. There is no evidence that the fields are used for anything other than a purely secular purpose. In fact, at oral argument on the motion for summary judgment, Plaintiffs conceded that the athletic activities at the heart of this matter are purely secular. The context and circumstances of the conduct promote no religious message.

Plaintiffs argue that the City has granted religious schools field space at the expense of public schools, thus assisting and endorsing the Catholic religion. The record, however, does not support Plaintiffs' assertion. The Supreme Court has consistently rejected the premise that conduct which in some manner aids an institution with a religious affiliation violates the Establishment Clause. See Mueller, 463 U.S. at 393. It is "well-established" that a state may reimburse parents for expenses associated with transporting their children to and from school and that a state may loan secular textbooks to all schoolchildren within the state. Id. Some benefit flowing from the government to religion is permissible, as "not every [practice] that confers an indirect, remote or incidental benefit upon [religion] is, for that reason alone, constitutionally invalid." Lynch, 465 U.S. at 683 (internal quotation marks and citation omitted).

The City's conduct makes City athletic facilities available to all students attending junior high and high schools in the City. Ownership of the facilities remains with the City and no funds are furnished to religious schools. See Board of Education of Central School District No. 1 v. Allen, 392 U.S. 236, 243-44 (1968). Access to athletic facilities is "separate and . . . indisputably marked off from . . . religious function . . . ." Everson v. Board of Education of

20

Ewing TP., 330 U.S. 1, 18 (1947). "As with the public provision of police and fire protection, sewage facilities, and streets and sidewalks [access to athletic facilities is] of some value to the religious school, but [is] nevertheless not such support of a religious institution as to be a prohibited establishment of religion within the meaning of the First Amendment." Allen, 392 U.S. at 242. The City's permitting policies are "free of religious trappings" and do not have the principal or primary effect of advancing religion. McCarthy v. Hornbeck 590 F. Supp. 936, 942 (D. Md. 1984).

Lemon's third prong requires that government conduct "avoid excessive government entanglement with religion." Ahlquist, ___ F. Supp. 2d at ____, 2012 WL 89965 at *12 (internal quotation marks and citation omitted). "Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." Agostini v. Felton, 521 U.S. 203, 233 (1997) (emphasis added). To "assess entanglement, [the United States Supreme Court] look[s] to the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." Id. at 232 (internal quotation marks and citation omitted). Courts also consider whether the conduct (1) requires "pervasive monitoring by public authorities" to protect against religious inculcation; (2) requires "administrative cooperation" between the government and religious schools; and (3) creates "political divisiveness." Id. at 233 (internal quotation marks and citation omitted). The last two considerations, however, are insufficient by themselves to create excessive entanglement. Id. In the final analysis, excessive entanglement requires more than mere interaction between church and state. Id.

While it is obvious that the private schools that benefit from the City's permitting policies

21

are sectarian, the nature of the benefit is wholly secular and there is no "relationship" between the City and religious authority. The permitting process requires minimal administrative cooperation between the City and the religious schools. The interaction is limited to the inevitable association necessary to request permits; that is, purely "ministerial or mechanical" tasks wholly removed from religious matters. Members of Jamestown School Committee v. Schmidt, 699 F.2d 1, 12 (1st Cir. 1983). This ministerial interaction certainly is not the excessive entanglement with religion that the Establishment Clause prohibits.

### B. The Endorsement Analysis

Under the "endorsement analysis, courts must consider whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion." Hanover School District, 626 F.3d at 10. The Establishment Clause prohibits government from "appearing to take a position on questions of religious belief" or "making adherence to a religion relevant in any way to a person's standing in the political community." Id. (internal quotation marks and citation omitted). A "practice in which the state is involved may not send[] the ancillary message to members of the audience who are nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Id. (internal quotation marks and citation omitted).

Whether the City's conduct is or is not constitutional "does not turn on the subjective feelings" of Plaintiffs. Id. at 11 (emphasis in original). In the endorsement analysis, the court assumes the viewpoint of an "objective observer acquainted" with the situation. Id. (internal

quotation marks and citation omitted).[12]  In essence, the analysis is distilled to whether a

reasonable observer, undertaking an objective inquiry, would conclude that the City's actions

have the effect of endorsing religion.  Id.  Thus, the Court is not required to ask

> whether there is any person who could find an endorsement of religion, whether
> some people may be offended by the [conduct], or whether some reasonable
> person might think [the City] endorses religion.  Rather, [the Court] considers
> whether a reasonable observer . . . aware of the history and context of the
> community and forum in which the [challenged conduct occurs] would understand
> it to endorse religion or . . . one religion over another.

Skoros, 437 F.3d at 30 (emphasis in original and emphasis added) (internal quotation marks and

citations omitted.)

This Court's analysis turns on how a "reasonable and objective observer, fully aware of

the background and circumstances," would view the City's permitting procedures.  Ahlquist, ___

F. Supp. 2d at ____, 2012 WL 89965 at *14.  There is no evidence that the fields are used for

anything other than a purely secular purpose.  The sectarian school students are receiving a

benefit available to all junior high and high school students in the City.  Public schools receive

preferential assignments for all games.  The Court concludes that a reasonable observer aware of

the relevant circumstances and context of the City's conduct would not perceive a message of

governmental endorsement or sponsorship of religion.[13]

### V.  Equal Protection

Plaintiffs claim that the City's permitting policies violate Equal Protection because City

---

[12]"Because it makes no difference to the outcome, [the Court] need not [mull] the nuances of which
observer is at play: for instance, whether the relevant observer is any adult, the parent, the student, the mature student
or the immature student."  Hanover School District, 626 F.3d at 11 n.19.

[13]Plaintiffs make no claim of coercion.  Consequently, the Court need not perform a coercion analysis.

officials have unfettered discretion to grant or deny permits.[14]  Plaintiffs do not develop their

equal protection argument.[15]  "[I]ssues adverted to in a perfunctory manner, unaccompanied by

some effort at developed argumentation, are deemed waived." United States v. Zannino, 895

F.2d 1, 17 (1st Cir. 1990).

## VI. Conclusion

Plaintiffs have failed to carry their burden of proving that the City has offended

Constitutional protections.  For the reasons set forth, the Clerk is directed to enter judgment in

favor of Defendants.


SO ORDERED.


 /s/ Mary M. Lisi
Mary M. Lisi
Chief United States District Judge
May 4, 2012

---

[14]Plaintiffs allege that the City has violated the Equal Protection Clause of the Fifth and Fourteenth Amendments.  The Court's approach to a Fifth Amendment Equal Protection claim is the same as the approach to a Fourteenth Amendment Equal Protection Claim.  United States v. Neto, 659 F.3d 194, 201 n.7 (1st Cir. 2011).

[15]At the hearing on the motion for summary judgment the Court informed Plaintiffs that their papers did not include a well-developed Equal Protection argument.  Plaintiffs ignore the Court's warning at their own peril. Plaintiffs "claiming an equal protection violation must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate that [P]laintiffs were singled out for unlawful oppression." Ayala-Sepulveda v. Municipality of San German, 671 F.3d 24, 32 (1st Cir. 2012) (emphasis in original) (internal quotation marks and citation omitted).  A similarly situated person is one who is roughly equivalent to the plaintiff in all relevant respects. Clark v. Boscher, 514 F.3d 107 (1st Cir. 2008)